EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* ELADIO BERMÚDEZ PÉREZ, acusado y apelante.

*Número:* CR-66-126      *Resuelto:* 24 de abril de 1967

---

*Héctor M. Martínez Colón,* abogado del apelante; *J. F. Rodríguez Rivera,* Procurador General Interino, y *Américo Serra,* Procurador General Auxiliar, abogados de El Pueblo.

Examinados los autos y considerados los alegatos de las partes, se revoca la sentencia dictada por el Tribunal Superior, Sala de Ponce, en 29 de julio de 1964. *Pueblo* v. *Soto Zaragoza,* 94 D.P.R. 350 (1967).

Así lo pronunció y manda el Tribunal y firma el Señor Juez Presidente quien, al igual que el Juez Asociado Señor Belaval, concurre en la Opinión Disidente emitida en este caso por el Juez Asociado Señor Santana Becerra.

(Fdo.) LUIS NEGRÓN FERNÁNDEZ
*Juez Presidente*

Certifico:

(Fdo.) JOAQUÍN BERRÍOS
*Secretario*

—O—

Opinión disidente emitida por el Juez Asociado Señor Santana Becerra en la cual concurren el Juez Presidente Señor Negrón Fernández y el Juez Asociado Señor Belaval.

San Juan, Puerto Rico, 24 de abril de 1967

Este caso se resuelve por el Tribunal en la siguiente sentencia:

"Examinados los autos y considerados los alegatos de las partes, se revoca la sentencia dictada por el Tribunal Superior, Sala de Ponce, en 29 de julio de 1964. *Pueblo* v. *Soto Zaragoza,* 94 D.P.R. 350 (1967)."

Al igual que en varios otros casos de bolita que de poco tiempo a esta parte el Tribunal ha venido resolviendo en

forma parecida, este fallo de ahora se emite bajo supuestos de ley, en lo que respecta a nuestra función de decidir como Tribunal de segunda instancia, con los cuales no estoy del todo conforme, amparándome en las tradicionales normas que rigen la función revisora a distinción de la función sentenciadora. Me permito exponer a continuación los fundamentos de mi inconformidad pero antes, un breve historial como cuadro de fondo.

## I

La Ley Núm. 220 de 1948 declaró estorbo público la bolita, el bolipul y otras combinaciones y loterías clandestinas, e instruyó y ordenó a la Policía de Puerto Rico y a cierta fuerza especial de investigación creada en dicha Ley para que previa orden de allanamiento expedida por magistrado competente cuando fuere necesaria, *ocupara* y pusiera a disposición de la corte correspondiente cualquier mimeógrafo, artefacto, material, monedas, enseres o cualesquiera implementos que se estuvieran utilizando o pudieran utilizarse para manipular y poner en circulación el negocio de los juegos conocidos como bolita, bolipul y otras combinaciones clandestinas; y también, para que arrestara a toda persona que infringiera las disposiciones de esa Ley. Dispuso que cuando la policía de Puerto Rico o esa fuerza especial de investigación, previa orden de allanamiento cuando fuere necesaria, sorprendiera a una o varias personas en cualquier habitación, casa, edificio, . . . o sitio de cualquier clase dedicadas a la manipulación de los juegos conocidos por bolita, bolipul y tales combinaciones y loterías clandestinas, debería *incautarse* de todos los implementos, monedas, artefactos, materiales y enseres y dar traslado del asunto al fiscal para el procesamiento de dicha persona o personas. Si al momento de ejecutar el allanamiento no hubiera persona alguna dentro de dicho local, la Ley presumió que la persona o personas en posesión del local allanado

como arrendatario, dueño o en cualquier otra forma, se considerarían como responsables de la manipulación ilegal de tales artefactos.

La Sec. 4 de la Ley Núm. 220, la que ha servido para la inmensa mayoría de las condenas bajo este estatuto, dispuso que toda persona que fuere sorprendida *portando o conduciendo o que tuviere en su poder* en cualquier concepto cualquier papeleta, billete, *"ticket"*, libreta, lista de números o letras, boletos o implementos que pudieren usarse para los juegos ilegales de la bolita, bolipul, y tales loterías clandestinas, y toda persona que poseyere, vendiere, o en cualquier otra forma transportare *éstos* o cualesquiera *otros análogos* que se pudieren utilizar o usarse en dichos juegos ilícitos, o conectados con la práctica de los mismos, incurre en delito y se le arrestaría inmediatamente, dándose traslado del caso sin demora al fiscal con jurisdicción para el proceso correspondiente. Estatuyó la Sec. 9 que toda persona que comprare o en cualquier forma adquiriera cualquier billete, papeleta, *"ticket"*, lista de números o letras, boletos o implementos usados en los juegos prohibidos por la Ley incurre también en delito público y será arrestada inmediatamente para ser procesada.

A la luz de las expresiones de ley usadas en el texto transcrito, el Poder Ejecutivo adoptó la posición desde un principio que en los procesos por infracciones de esta Ley debía producirse evidencia material de tales enseres, artefactos, listas, boletos y demás implementos mencionados. Toda acusación era precedida de la obtención de tal evidencia material a ser presentada en el juicio, obtenida dicha evidencia tras órdenes de allanamiento o en consecuencia de registros incidentales a un arresto o detención legal. Suprimida por el Tribunal la evidencia material aludida cuando por algún quebrantamiento de ley en el proceso de su obtención se suprimía, no había convicciones de bolita.

Mientras las declaraciones juradas para obtener la orden de allanamiento en busca de material de bolita eran inmunes a ataque en cuanto a la veracidad de los hechos en ellas expuestos, este sistema de persecución funcionó por muchos años, en aparente satisfacción del Gobierno. Cuando esas declaraciones quedaron abiertas a ataque en cuanto a la veracidad de los hechos en ellas expuestos,—*Pueblo* v. *Torres*, 80 D.P.R. 245 (1958)—el sistema sufrió, y puede decirse que la persecución empezó a dejar de ser lo efectiva de antes. No sólo era más depurado el proceso de pedir órdenes de allanamiento sabiendo el agente que habría de exponerse a una confrontación con la verdad de los hechos expuestos por él para obtener la orden, sino que la evidencia obtenida fue susceptible en mayor escala de ser suprimida, como lo fue, por las Salas sentenciadoras debido a dudas sobre la realidad y credibilidad de esos hechos. Suprimida la evidencia por razones de credibilidad en el incidente de allanamiento, aun cuando las formas de su obtención se ajustaran a la ley, tampoco había convicciones.

Ante la realidad expuesta apareció lo que podría llamarse una segunda etapa en la manera de perseguir la bolita, y advino característicamente el agente encubierto. Por la experiencia que derivo de la gran mayoría de los casos que han venido a conocimiento del Tribunal, bajo esta segunda modalidad la obtención de evidencia material a través de la orden de allanamiento quedó prácticamente en desuso, por lo menos, en cuanto a las infracciones de la Sec. 4, las más perseguidas.

## II

En 13 de mayo de 1960 Librado Seda fue convicto en la Sala de Mayagüez del Tribunal Superior en 19 casos por infracción a la Sec. 4 de la Ley de Bolita con la declaración, como única prueba, de un agente encubierto que expuso que en tantas ocasiones le había jugado a Seda el número 935 con

la cantidad de $1 para el juego ilegal de la bolita, número que Seda apuntaba en un pedazo de papel donde tenía apuntados otros números de tres cifras seguidos de guión y otras cantidades a la derecha para dicho juego ilegal; y que una vez Seda le había entregado $22.50 al aceptar una aproximación del número 935, dinero que quedó admitido en evidencia.

En *Pueblo* v. *Seda*, 82 D.P.R. 719, decidido el 23 de mayo de 1961, confirmamos las convicciones y se aseguró carta de validez a la persecución y convicción de bolita mediante el testimonio único de un agente encubierto sin prueba material alguna. ([1])

Voté a favor de la confirmación de las sentencias condenatorias en *Seda* aun cuando no hubo ausencia del todo de cierta preocupación y temor de que con el correr del tiempo la situación pudiera degenerar peligrosamente para las garantías del ciudadano en lo que parece que ahora se está palpando. Hacer descansar el proceso de la culpabilidad o inocencia del acusado únicamente sobre el filo de la credibilidad de una persona—el encubierto—como el único factor, y éste altamente subjetivo, podía desembocar a la larga en una situación insegura tanto para el ciudadano procesado como para el Gobierno. Mientras los magistrados sentenciadores estuvieran creyendo al agente encubierto, y al principio eso sería así, las convicciones habrían de sucederse de manera sistemática y rutinaria con el testimonio estilo *Seda*, ante la casi imposibilidad del acusado de demostrar en corte que el agente está mintiendo. ([2])

---

([1]) Confirmado en *Seda Alvarez* v. *People of Puerto Rico*, 299 F.2d 576 (1st Cir. 1962); *cert. den. Alvarez* v. *Puerto Rico*, 370 U.S. 904.

([2]) La experiencia nos enseña que cualquier persona que conviva un tiempo en una de nuestras comunidades, de ordinario pequeñas, se informa por el rumor y decir públicos de quiénes son los que trafican con bolita en esa comunidad, aunque nadie presente un fallo condenatorio contra ellos o prueba de haber sido encausados. Para un agente encubierto inescrupuloso pero con la convicción de tal conocimiento, la situación puede ser fácil para un caso hecho o un testimonio falso.

Por otra parte, y esta vez en detrimento del Gobierno, cuando los magistrados sentenciadores con el tiempo y la repetición empezaran a dejar de creer al agente encubierto ante un testimonio que ahora este Tribunal ha calificado de "estereotipado", podrían igualmente sucederse las absoluciones de manera sistemática y rutinaria, aun cuando las infracciones siguieran cometiéndose. Ese era el peligro de depender, en uno u otro sentido, únicamente de la credibilidad dada a una sola persona.

La preocupación y el temor con la situación expuesta justifica la advertencia hecha en el propio caso de *Seda*: (pág. 733)

. . . "Pretender que a los fines de establecer el delito sea necesario producir *en todos los casos* evidencia documental, consistente en el boleto o en listas de números, es dejar abierto un amplio camino por donde fácilmente se escaparían los infractores. Esa no puede haber sido la intención legislativa. Ahora bien, si esa evidencia está disponible, o puede obtenerse sin grandes dificultades, debe ser presentada, o cuando menos, la omisión de hacerlo, debe ser explicada en forma satisfactoria. En el presente caso, la omisión de presentar la prueba 'material' se justificó plenamente. Por otro lado, el acusado no presentó prueba alguna, y prefirió descansar en las cuestiones de derecho planteadas, obviando con su actuación cualquier ejercicio por el tribunal sentenciador de su función de apreciar la evidencia. Convenimos en que en los casos en que no se presenta la prueba a que se refiere el acusado, el tribunal debe ser muy cauteloso en la apreciación, y debe exigir que se demuestre cumplidamente, como se hizo aquí, que no fue posible obtener dicha prueba, a pesar de desplegarse la debida diligencia."

Bajo el sistema del agente encubierto resultó ser más fácil escribir la advertencia que hacerla valer en la realidad. La no presentación de prueba material fue sistemáticamente justificada por los jueces sentenciadores y por este Tribunal ante la explicación fácil y rutinaria del agente de que su obtención

tendía a destruir su condición de encubierto y a divulgar su identidad. El no arresto inmediato del infractor como manda la Ley fue sistemáticamente justificado por las Salas sentenciadoras y por este Tribunal por el mismo fundamento de la identidad del agente. La tardanza en procesar, unos 6 meses en *Seda* pero hasta diez, once y cerca de un año en otros casos, fue también justificada por igual razón de la identidad del agente. Véase *Pueblo* v. *Seda,* citando a la vez a *Pueblo* v. *Tribunal Superior,* 81 D.P.R. 455 (1955). Más bien se le impuso al acusado el peso de la prueba para demostrar que la tardanza le había impedido defenderse. En este aspecto fue que se consideró el factor de tardanza, pero no como elemento que afectara adversamente la credibilidad del agente.

Entre mayo de 1961 en que se resuelve *Pueblo* v. *Seda* y hasta el 30 de junio de 1966 rigieron esas normas sin alteración alguna en la persecución y convicción judicial de los infractores de bolita. Con una que otra excepción, de ordinario este Tribunal confirmaba bajo los supuestos (1) que la declaración del agente—por lo regular al efecto de que en un determinado sitio y hora o día le jugó al acusado un número de bolita (ante la imposibilidad de controvertir el testimonio oral en este sentido lo mismo podía ser el 728 que el 827)— era testimonio suficiente en derecho para una convicción, y (2) que habiendo el juez sentenciador creído ese testimonio, no había razón para intervenir con el fallo condenatorio.

## III

En junio 30 de 1966 se resuelve el caso de *Pueblo* v. *Ayala Ruiz,* 93 D.P.R. 704 (1966). En este fallo la versión típica del agente a que he venido refiriéndome se caracterizó como una "versión estereotipada", y la declaración tradicional del agente en este caso específico que sirvió para la convicción, como un testimonio "flaco y descarnado".

Según interpreto y entiendo la decisión de *Ayala Ruiz*, (³) el caso no se resuelve a base de insuficiencia legal de la prueba, para una convicción, aunque por momentos parece ser así. Se estima más bien que al juez sentenciador no debió merecerle crédito el testimonio del agente encubierto (véase escolio 1 de esa opinión) y el Tribunal revoca a base de una duda razonable en segunda instancia. (⁴) Por la lectura de su récord, no me parece que la prueba en *Ayala Ruiz* fuera más débil que la tradicional a partir de *Seda* en tantos otros casos convictos. Existe quizás hasta un elemento corroborativo de la declaración del agente producido por el propio acusado. Contemporáneamente con la absolución en *Ayala Ruiz* en el mes de junio de 1966, para no ir más atrás, se confirmaron

---

(³) Por razones de enfermedad no tomé parte en la consideración, discusión y decisión de este caso.

(⁴) En *Ayala Ruiz*, el agente encubierto declaró que el 16 de septiembre de 1962 vio a Ayala en un garage de gasolina hablando con unas personas que estaban como a 5 ó 7 pies del agente; que Ayala les preguntaba qué números iban a jugar y ellos le decían el número; el agente se acercó y el acusado le dijo: "¿Tú también vas a jugar"?, le dijo que sí, le dio un dólar para que le jugara el 912; le dijo que era por las tres últimas cifras de la Lotería de Puerto Rico; entonces cogió el peso y apuntó el número en una libreta de esas de escuela, de esas que dicen "composition" donde tenía números de tres cifras seguidos por un guión y otras cantidades a la derecha. Que después de haber hecho las transacciones Ayala se montó en un carro con el número de tablilla 706-296 y se fue. No procedió a su arresto inmediato porque estaba trabajando como agente encubierto. No le tomó los nombres a dos personas más que estaban con el acusado ya que eso creaba malicia. No conocía al acusado antes de esa fecha y se situaba allí debido a que en aquel sitio había muchas violaciones de ley, vendían ron, caña, bolita y armas de fuego. Tardó tiempo en informar porque en el "argot" de ellos se estaba haciendo una redada y tenía que esperar órdenes de su Jefe. Pedirle algún papelito para en caso de que se pegara envolvía sospecha.

Ayala trató de establecer que él se encontraba en otro sitio con su declaración y la de dos testigos que más que hechos fueron sus conclusiones. La Sala no creyó esa prueba. En su testimonio directo Ayala admitió, a preguntas de su abogado, ser dueño del automóvil Núm. 706-296 y que el vehículo le había sido confiscado al arrestársele por bolita, corroborando en parte al agente.

ocho de otras diez convicciones de bolita bajo el mismo patrón de *Seda*.

En *Ayala Ruiz* se le da alguna consideración al elemento de la tardanza, no como un impedimento según *Seda* para prepararse una defensa—en realidad Ayala produjo prueba de coartada—sino por primera vez, como elemento relacionado con la veracidad y peso de la prueba.

## IV

La sentencia absolutoria del presente caso se basa en dos supuestos si bien no se expresan en la misma: (1) la prueba es suficiente en derecho para sostener la convicción y (2) que no debe merecerle al Tribunal entero crédito. La sentencia concluye que la prueba no establece la culpabilidad fuera de toda duda razonable y se absuelve. No sé hasta qué punto la conclusión deja de ser incompatible con el supuesto primero. ([5])

## V

Comprendo que puede haber llegado el momento por el cual hubo cierta preocupación en el caso de *Seda*. Nada impide que el Tribunal reexamine el efecto que con el transcurso del tiempo haya acumulado esa decisión. En lo que no estoy conforme es en la forma en que se pretende afrontar el problema. A partir de *Ayala Ruiz* parece haberse creado

---

([5]) El caso es típico del de *Seda* en sus hechos. El agente encubierto declaró que estando en un establecimiento tomando cerveza con otras personas el 20 de julio de 1963, llegó el acusado y se sentó en la mesa y le ofreció a uno de los presentes jugar un número. Aquél aceptó y le entregó $2.00. El acusado lo "chequeó" en una lista. A invitación suya otros jugaron, y jugó el agente el Núm. 037 con 60 centavos para un premio de $300. Pidió al acusado que le entregara el número y éste le dijo que bastaba que lo "chequeara" en la lista de números, cosa que hizo en su presencia. Presentó su declaración al fiscal el 15 de noviembre de 1963. El acusado trajo prueba tendiente a establecer su reputación, pero no controvirtió los hechos imputados.

un círculo vicioso. Lo "estereotipadas" que ahora resultan las declaraciones del agente encubierto es resultado inevitable, según apuntó con alguna razón el Procurador General en una reciente vista, del sistema mismo de perseguir la infracción. Se trata de actos similares de venta y apunte de números de bolita o del derecho, mediante paga, de participar en el juego o lotería. Por otra parte, fortalecer el testimonio típico considerado ahora "flaco y descarnado" con elementos corroborativos, evidencia material inclusive, tendería a destruir la personalidad encubierta del agente y prácticamente haría inefectivo el sistema. Por lo menos, eso es lo que el Gobierno explica. En cuanto a la tardanza en enjuiciar también justificada para preservar el sistema encubierto, la misma no opera necesariamente en proporción directa de causa y efecto en lo que respecta a la veracidad. Un caso falso y fabricado por el agente no gana credibilidad porque la persona sea enjuiciada en relativamente poco tiempo. A la inversa, una infracción verdaderamente cometida no debe perder credibilidad porque se procese más tarde. Surgiría siempre el problema, a menos que se arrestara inmediatamente lo cual daría al traste con la identidad, de dónde trazar la línea divisoria en la tardanza que afectara o en la que no afectara la veracidad. Esto nada tendría que ver con el punto de la posible indefensión del acusado por dicha tardanza, lo cual presenta un distinto aspecto.

El problema lo engendra actualmente el sistema mismo, que debe reexaminarse. No lo crea la manera en que los jueces sentenciadores han venido disponiendo de cada caso en particular siguiendo la norma de derecho de *Seda*. Es incuestionable que este Tribunal tiene una función supervisora correctiva de las actuaciones de las Salas de primera instancia, y que cada caso, lo mismo civil que criminal, ha de resolverse a la luz de sus propios hechos. Pero el problema en todos estos casos lo origina un *patrón común* de persecución de las in-

fracciones de bolita, distinto a lo que acontece cuando se trata de un caso aislado de todo un sistema de investigación.

En el ejercicio de nuestra función de supervisión judicial estamos sujetos, como todo tribunal de segunda instancia, a ciertas normas cuya conveniencia y bondad ya están probadas por el tiempo y la experiencia. Entre ellas, quizás la más importante, el que la función de dar crédito corresponde fundamentalmente al juez sentenciador.

Reafirmar el criterio de que la prueba del agente encubierto, "flaca" como se haya caracterizado es suficiente en derecho para sostener una convicción, pero trasladar aquí a la segunda instancia, caso por caso, la función de pasar sobre la veracidad que merece el agente y la prueba y confirmar; o de no dar crédito, y absolver por duda razonable, no me parece ser la mejor norma de encarar el problema, que repito es el de un sistema típico de perseguir cierto delito. Entiendo que ello crea una situación plagada de dificultades para el propio Tribunal en la disposición de estos casos, siendo como es la credibilidad un factor esencialmente subjetivo en el proceso mental de formar juicio. Tampoco permite la orientación necesaria a los jueces sentenciadores y al propio Gobierno, si es tiempo ya de que busque otros métodos de dar con los infractores de la bolita. Tienen ellos derecho a saber si *Pueblo* v. *Seda* sigue siendo aún buena ley o si por un proceso indirecto de erosión está desvirtuado. (⁶)

No creo que *Pueblo* v. *Seda* y *Pueblo* v. *Ayala Ruiz* puedan coexistir cada uno con toda su plena fuerza jurídica. La ca-

---

(⁶) El concepto de duda razonable no se desarrolla de igual manera en primera y en segunda instancia o apelación. El juzgador de los hechos llega a ese estado después de pesar, equilibrar, resolver conflictos, explicar conflictos, creer a unos, no creer a otros, creer en parte o en totalidad, funciones éstas reservadas al juez sentenciador o al jurado. En segunda instancia, donde no hay esa función, un estado de duda razonable tendría que descansar en una prueba según haya sido ya creída y dirimida por el juzgador. El concepto entonces se identifica y se funde en el otro de la suficiencia legal de prueba competente para sostener en segunda instancia una convicción.

racterización de *Ayala Ruiz*, si ha de predominar, debe conducir a la conclusión de que esta prueba, así, es insuficiente en derecho para encarcelar a un ciudadano. El Gobierno deberá buscar prueba de mejor quilate. Pero si *Seda* conserva toda su fuerza, no hay razón para intervenir aquí con la tradicional función que le es privativa al juez sentenciador, la función de la credibilidad. Por supuesto, quedan salvados aquellos casos en que obviamente la evidencia sea irreal, o intrínsecamente increíble, o que todo indique que se trata de un caso falso, fabricado por el agente, en cuyo caso el agente mismo debe merecer tratamiento separado.

La duda razonable que se invoca en este caso no surge de la prueba según la creyera la Sala sentenciadora sino del traslado de esa función primaria a esta segunda instancia. Siendo a mi entender injustificado intervenir con dicha función y por otra parte, considerada la prueba suficiente para sostener la convicción, opino que ésta debe confirmarse.

Por las consideraciones expuestas que representan mi posición en éste y en otros casos de bolita que ofrecen parecido problema pendientes en el Tribunal, he disentido.