EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* ARCADIO BERDECÍA RODRÍGUEZ, acusado y apelante.

*Número:* CR-67-5        *Resuelto:* 16 de mayo de 1968

*Enrique Corchado Juarbe,* abogado del apelante; *J. F. Rodríguez Rivera, Procurador General Interino, y Peter Ortiz, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Convicto por tribunal de derecho del delito de incesto cometido en el cuerpo de una hija, y sentenciado a la pena de cuatro a ocho años de presidio, el apelante nos presenta siete apuntamientos de error, en apoyo de su apelación de dicho fallo.

Los primeros seis apuntamientos giran alrededor de la paternidad de la perjudicada, insistiendo el apelante en que por estar casada la madre de ella con otro individuo a la fecha de la concepción y del nacimiento de la perjudicada,

ésta tenía el status de hija legítima de otro hombre, circunstancia que no se puede impugnar en un proceso criminal.

No es necesario considerar la anterior cuestión pues concluimos que tiene razón el apelante en su séptimo apuntamiento al efecto de que la versión de los hechos que expresó la perjudicada es inverosímil, increíble y teñido de prejuicio y pasión. Veamos en más detalle dicha versión.

La perjudicada testificó que el apelante era su padre; que ella tenía de 17 a 18 años de edad; que estaba en la Escuela Industrial de Niñas, que tuvo un hijo en febrero de 1966; que el padre del niño es el apelante; que lo procreó del apelante porque vivía en casa de éste en junio de 1965; que el apelante se pasó a la cama de ella y tuvo contacto con ella; que en la casa vivían 15 personas, es decir, el apelante, la madrastra de la perjudicada y doce hermanos; que cuando el apelante se metió en la cama ella gritó y lloró; que él estaba "picao"; que el hecho ocurrió de once y media a doce de la noche. Testificó, además, que la familia dormía en dos cuartos contiguos. La madrastra no hizo nada—no sabe si se enteró pero debió darse cuenta pues estaba en la casa. Hacía cinco meses que vivía con el apelante y la madrastra. Antes vivía con su abuela, la madre del apelante. No dijo nada de lo ocurrido porque no la dejaban ir afuera durante dos meses. Entonces cuando él se dio cuenta de lo que había hecho, de que ella estaba encinta, la botó de la casa. Se fue a casa de la abuela quien la hizo examinar y resultó que estaba encinta. La abuela le dijo que se quedara callada. La mamá de la perjudicada la llevó al tribunal. En 1963 la perjudicada se había ido con un joven pero los detuvieron. Al joven lo enviaron a su casa y a ella el tribunal dispuso que quedase bajo la custodia de su padre y de su madre. Fue a vivir a casa del apelante luego de un disgusto con una hermana en casa de la madre de la perjudicada. La noche de los hechos, una hermana de seis años dormía en la misma cama con ella y otra de 12 años dormía en el

piso "bien cerca". El testimonio de la perjudicada en cuanto a cómo se dividía la familia en los dos cuartos es confuso. Primero aceptó que en un cuarto dormían las mujeres con la madrastra y en el otro los hermanos varones con el apelante. Luego corrigió para decir que en uno dormía "Él, una hermanita mía y ella." El contrainterrogatorio continúa así:

Lcdo. Corchado Juarbe:

"¿Y en la sala duermen cuántos?

Ninguno.

¿Y los otros muchachos dónde duermen?

En el otro cuarto.

¿En dos cuartos? ¿O sea, hay dos cuartos?

Sí, señor.

¿En estos dos duermen . . .?

Sí, señor, porque está dividido.

¿O sea, que el cuarto de ustedes, el cuarto en que duerme Arcadio y su esposa, y duerme Ud., y los otros hermanitos, es un cuarto grande, que tiene una división a media pared?

Sí, señor.

¿Que no puede ser una división hasta arriba, es únicamente hasta media pared?

Sí, señor.

.     .     .     .     .     .     .     .

¿De modo que en ese cuarto únicamente dormían seis personas, dormían seis personas?

Bueno, sí.

¿Dormían ustedes tres, y ellos en uno; en el otro estaban los otros hermanitos, en el otro lado?

Sí, señor.

¿En el otro cuarto dormían cuántos?

Son dos cuartos nada más; en uno hay tres camas.

¿En uno hay tres camas?

Y la de mi papá. No hay una nada más.

¿Y duermen allí, entonces, él, la esposa, y los nenes?

Sí, señor.

¿En el otro ustedes nada más?

Sí, señor.

¿No dijo Ud. que allí no habían nada más que dos camas?

En el de los muchachos hay tres camas.

¿En esas tres camas duermen el resto de los nenes que tienen qué edad?

Uno diez y nueve.

¿Uno diez y nueve?

Otro diez y siete.

Mire a ver, alguno . . . esos eran sus hermanitos, suyos, también?

TESTIGO:

Sí, señor.

¿Esos duermen allí también?

Sí, señor.

¿Los otros están más grandecitos, menores algunos, y otros más pequeños?

Sí, señor.

¿Lo que quiere decir que todos los quince de ustedes, dormían esa noche, en un área, que no es más grande que de esta puerta, hasta aquí, así cuadrado? Diríamos de esa puerta a esta mesa, a esta columna?

Sí, señor.

¿Allí estaban todos?

Sí, señor.

HON. JUEZ:

A los efectos del récord, ¿cuánto determinan las partes que sería el área que cubren los cuartos?

LCDO. CORCHADO JUARBE:

Podríamos estipular alrededor de diez y ocho por veinticinco."

Cuando ella gritó, ninguno de los hermanos se despertó.

Del contrainterrogatorio surgió que la perjudicada le guardaba rencor al apelante porque éste no la dejaba salir de la casa y porque le dijo que ella le estaba cogiendo dinero. No se hablaban. Cuando necesitaba algo se dirigía a su madrastra. Continúa el contrainterrogatorio:

LCDO. CORCHADO JUARBE:

".     .     .     .     .     .     .     .

"¿No le gustaba a Ud. que le dijera que no le permitía ir en casa de su abuela, ni en casa de su mamá?

No me gustaba, porque yo no iba a hacer nada malo.

¿Sin embargo Ud. había tenido problemas de distinta naturaleza en la comunidad?

(No hay contestación).

¿Eso es cierto?

(No hay contestación).

¿Después que Ud. tuvo el incidente con Santos, no es cierto, verdad, eso?

TESTIGO:

Sí, señor.

¿Sí, señor?

Sí, señor.

¿Y cada vez que tenía ese problema, era este señor que está aquí, el que tenía que intervenir y llamarle a Ud. la atención; eso es así también?

TESTIGO:

Sí, señor.

.  .  .  .  .  .  .  .

¿Que Ud. se escondió, se fué para su casa, eso no es cierto?

No es cierto.

Ahora, ¿mire a ver, es cierto que el Policía Meléndez tuvo que buscarla allí por mucho tiempo para retornarla al Hogar Juvenil; eso es verdad?

Sí, señor.

¿Dónde estaba Ud. durante todo ese tiempo que el Policía Meléndez la estaba buscando?

¿A mí? Yo estaba con una amiga mía.

¿Esa amiga suya, cómo se llama?

No le sé el nombre.

¿Cuántos días estuvo con la amiga de Ud.?

Dos días estuve.

¿Esos dos días, Ud. no estuvo en la casa de Berdecía?

No, señor.

¿Dónde estuvo?

Viviendo con mi amiga.

¿Dónde?

En casa de ella.

¿Dónde era la casa de ella?

En Coamo.

¿Qué calle, qué sitio específicamente?

TESTIGO:

En un sitio que le dicen Calle Pulguillas.

LCDO. CORCHADO JUARBE:

El Policía, dónde la encontró?

El Policía me encontró en Coamo.

¿Qué sitio?

En casa de mi mamá.

¿Cuántas veces fué el Policía a buscarla en casa de su mamá, y cuántos días estuvo, o no estuvo?

No sé.

¿Mire a ver si es o no cierto que Ud. estuvo mucho más de dos días fuera de su casa?

No, señor.

¿Y cuando el Policía Meléndez la encontró la trajo al Departamento Juvenil, a la oficina de Bienestar, es o no es así?

(No hay contestación)

No contesta.

¿Ese grito que Ud. dice que se sacó, no despertó a los otros niños?

No sé si se despertaron.

¿Y su hermana estaba allí acostada, verdad, la nena chiquita?

(No hay contestación)

Dígame, ¿estaría de allí, a donde estoy yo?

Sí, señor.

LCDO. CORCHADO JUARBE:

¿Aproximadamente un pie?

TESTIGO:

Sí, pero la nena después se despertó.

¿Y la otra nena de doce años, que estaba en el piso, a qué distancia estaba de Ud.?

Bien cerca.

¿Bien cerca?

Sí, señor.

¿Doña Francisca y los nenes estaban también a qué distancia de Ud., estarían a la distancia de ahí, donde está Ud. a dónde, al estrado del Hon. Juez?

Sí, señor.

¿A aproximadamente tres pies?

Sí, señor.

¿Estaba despierta?

Supongo yo que ella estaba despierta.

¿A qué distancia estaban de Ud. los otros siete u ocho hermanos suyos, que dormían en la misma casa?

(No hay contestación)

¿Estarían de donde Ud. está a donde estoy yo ahora, o, menos?

(No hay contestación)

¿Más cerca?

Más o menos así.

HON. JUEZ:

¿Qué distancia calculan las partes?

LCDO. CORCHADO JUARBE:

Estipulamos nueve pies.

HON. JUEZ:

Fiscal.

HON. FISCAL:

Diez pies.

LCDO. CORCHADO JUARBE:

De nueve a diez pies.

.        .        .        .        .        .        .        .

¿Por qué la llevó su mamá al Cuartel de la Policía?

Bueno, porque . . .

¿Cómo?

Porque yo no la respetaba a ella.

.        .        .        .        .        .        .        .

¿Que Ud. quería . . . dígale al Tribunal lo que quería . . . sino que Ud. quería salir a pasear y estar con su amiguita, o no es así eso?

No, señor.

¿Pero, hace un momento Ud. dijo que era así?

Bueno, porque yo, yo quería estar con mi amiga, porque eso no es malo.

¿Y esa, esa amiga suya, a qué se dedicaba, testigo?

Bueno.

¿Usted conoce a La Gata?

Sí, señor.

¿Esa es amiga suya?

(No hay contestación)

Es o no es esa la muchacha con quien Ud. estuvo esos dos días?

Bueno, era, pero ya no es.

¿Era su amiga, pero ya no es; esa es La Gata?

Sí, señor.

¿Es o no es cierto que La Gata era una muchacha del sitio, al cual . . . que trabajaba en bares?

No lo sé.

¿Eso era lo que su madrastra y su papá no querían, que Ud. saliera?

(No hay contestación)."

A preguntas del fiscal la perjudicada testificó que el apelante "a mí me daba, me maltrataba, me botaba de la casa . . . Me acusaba de que le robaba." El juez sentenciador intervino en el interrogatorio, así:

"HON. JUEZ:

Ud. dijo que Ud. gritó. ¿Pasó algo? Ud. contestó que Ud. gritó, ¿qué pasó allí, ocurrió algo, qué pasó? Explique cómo fué.

(No hay contestación)

Ud. dijo que gritó, y que Arcadio, el acusado, tuvo, Arcadio, relaciones con Ud. ¿Cómo era eso?

¿Cuando yo grité?

Desde el primer momento. ¿Qué ocurrió allí; si Ud. estaba despierta, o estaba dormida; qué fué lo que pasó?

Yo estaba quedándome dormida, cuando él vino a mi cama, cuando yo me estaba quedando dormida, cuando él fué a mi cama; me rompió la ropa interior; yo seguí gritando, a ver si mi madrastra salía a defenderme; ella no salió; entonces, mi papá, un revólver que tenía me lo puso aquí, y me dijo que si no me dejaba hacer eso, me iba a matar.

.    .    .    .    .    .    .    .

HON. JUEZ:

. . . ¿qué más pasó?

TESTIGO:

No pasó más nada.

¿Ud. dice que le puso un revólver, qué más pasó?

Me lo quitó; yo le dije que lo iba a decir; él me dijo que si decía algo, si gritaba, me mataba; y allí, pues, al poco tiempo, que él sabía que yo estaba encinta, él más o menos, lo tenía que saber, pues delante de mi abuela me dió y me dijo que no me quería en la casa, entonces, mi abuela me recogió en casa de ella.

¿Dice que estaba dormido cuál otro de sus hermanitos?

Bueno, mi hermanita de doce años, digo, la de seis años, la de seis años estaba despierta.

¿Durante ese tiempo se despertó alguno de ellos?

La chiquita, que estaba conmigo.

¿Y qué pasó después?

No pasó más nada."

El anterior es un resumen de toda la prueba presentada sobre el acto que motiva la acusación. Demuestra que la perjudicada era una joven descarriada, que había tenido experiencia sexual con anterioridad al acto que le imputa al apelante, que se había fugado del Hogar Juvenil a donde fue recluida a petición de su madre porque la perjudicada no la respetaba. Fue encontrada por la policía en Coamo en casa de una amiga conocida como La Gata, donde había permanecido dos días. También tuvo muchos disgustos con el apelante mientras vivía en casa de éste y con tal motivo le guardaba rencor. Estas circunstancias y actitudes de la perjudicada hace aún más increíble la ocurrencia del hecho que la perjudicada imputa al apelante, ocurrencia de sumo improbable, en vista de las circunstancias en que, según la perjudicada, se consumó dicho hecho. Su forma evasiva y confusa de testificar, su esfuerzo por evitar contestar muchas preguntas, la ocurrencia del acto estando presentes otras personas muy cerca de la cama en que ocurrió, una yacente en esa misma cama, sin que uno siquiera inquiriera qué ocurría a pesar de que la perjudicada dice que gritó y lloró, nos obliga a concluir que su testimonio no debió merecer credibilidad al extremo de que constituyese prueba del hecho imputado más allá de toda duda razonable.

*Por lo tanto, se revocará la sentencia dictada en este caso por el Tribunal Superior, Sala de Ponce, en 16 de septiembre de 1966, y se absolverá al acusado.*

El Juez Asociado Señor Santana Becerra concurre con el resultado en opinión separada, en la cual concurre el Juez Asociado Señor Hernández Matos. El Juez Presidente Señor Negrón Fernández disintió.

—O—

Opinión del Juez Asociado Señor Santana Becerra concurriendo en el resultado, en la cual concurre el Juez Asociado Señor Hernández Matos

San Juan, Puerto Rico, 16 de mayo de 1968

Se resuelve este caso a base del 7mo. error señalado, que según reza, "El Tribunal erró al dar entero crédito a la versión de los hechos que expresó la perjudicada, a pesar de resultar los mismos inverosímiles, increíbles y teñidos de prejuicio y de pasión."

Un examen de la transcripción de la declaración de la perjudicada, único testigo de los hechos, tanto de su testimonio directo como de todo el contrainterrogatorio, y el interrogatorio a que la sometiera el juez, me convence que dicha declaración no es inherentemente irreal e increíble.

En las condiciones sub-humanas y de promiscuidad en que vive un sector infeliz de nuestra sociedad, no es un hecho irreal la relación sexual matrimonial en aposentos donde también duermen niños pequeños y otros de la familia. La prueba no disputada demuestra que el acusado realizó el acto bajo los efectos de bebidas embriagantes, y que la madrastra de la perjudicada estaba también bajo los efectos de dichas bebidas en un cuarto contiguo. A pesar de la presión puesta en el contrainterrogatorio a esta joven de 17 años, en todo momento ella mantuvo firme su declaración

de que el apelante realizó concúbito con ella. El juez que presidió la vista y que en todo momento demostró una actitud sumamente liberal hacia el acusado, dio crédito a ese testimonio y lo sentenció.

Una vez más se interfiere con esa función primaria del juzgador de primera instancia de dar crédito y de pesar los hechos. Acorde con mi posición en mis disidencias en los casos de Pueblo v. *Bermúdez Pérez*, 94 D.P.R. 363, y *Pueblo* v. *Soto Zaragoza*, 94 D.P.R. 350, resueltos el 24 de abril de 1967, y por las mismas razones que creo de buen procedimiento allí expuestas, rechazo otra vez la intervención en Segunda instancia con esa función básica del juzgador de los hechos.

Este caso, sin embargo, presenta un problema legal de mucha mayor hondura sobre la relación filial que no se resuelve sustituyendo el criterio de credibilidad de la Sala sentenciadora. Ese problema está señalado en los primeros seis errores que no se consideran.

Al terminar la prueba de cargo, todo lo que había en el récord era la declaración de la perjudicada diciendo que el acusado era su padre y un certificado de nacimiento de ella. La defensa pidió la absolución perentoria por razón de que no se había establecido la relación paterno-filial. Haciendo referencia al certificado de nacimiento de la perjudicada, el tribunal creyó, al denegar la solicitud, que la filiación surgía de dicho certificado. Ello fue un error, y en ese mismo error incurre involuntariamente el Procurador General cuando en su alegato nos dice que el certificado de nacimiento hace constar la paternidad.

El certificado de nacimiento que está en el récord demuestra que la perjudicada nació el 23 de noviembre de 1948. Aparecen ser sus padres Arcadio Berdecía, el acusado, y Carmen María Negrón. Sin embargo, del propio certificado aparece que quien inscribió a la niña e hizo la declaración fue la madre, Carmen María Negrón. Este certificado contiene

el reconocimiento de la madre, pero no el reconocimiento del padre.

En apoyo de una moción para desestimar la acusación presentada por la defensa después de practicada la prueba del Pueblo, el acusado trajo al récord el certificado de matrimonio de la madre, Carmen María Negrón, con otra persona. De dicho certificado surge que el matrimonio se celebró el 31 de mayo de 1940. A los únicos efectos de dicha moción para desestimar, el acusado ocupó la silla de testigos y declaró que Carmen M. Negrón y su legítimo marido vivían juntos. El acusado no presentó prueba oral en los méritos del caso.

Como prueba de refutación el fiscal hizo declarar a Carmen M. Negrón y de su declaración surge lo siguiente: (R. págs. 92–98)

"HON. FISCAL:

¿El nombre suyo, señora?

TESTIGO:

Carmen María Negrón.

¿Ud. conoce a Rosa María Berdecía Negrón?

Sí, señor, la conozco.

¿Que es ella de Ud.?

Hija.

¿Hija suya?

Sí, señor.

¿Quién es el padre?

LCDO. CORCHADO JUARBE:

Vamos a objetar, Sr. Juez.

HON. JUEZ:

No conteste. Fundamento.

. . . . . . .

HON. FISCAL:

¿Quién es el padre de esa niña?

TESTIGO:

Arcadio Berdecía.

LCDO. CORCHADO JUARBE:

Objeción a todo lo que declare en relación con el padre de la niña.

HON. JUEZ:

Que así se haga constar dicha objeción. Adelante, compañero.

HON. FISCAL:

Señora, ¿cuándo procreó Ud. a esa hija con el acusado?

TESTIGO:

En el 1947.

¿O sea, Ud. vivió con él?

(No hay contestación)

¿Ud. vivió con el acusado?

No; yo estaba en casa; él era chofer de la casa de casa, de un truck que tenía mi papá; nosotros tuvimos relaciones sexuales. Entonces, yo salí encinta de esa nena; entonces, él y yo nos vimos en un caso por Adulterio, y yo . . . contra ambos, que nos acusó el señor Francisco Muñoz; él era casado conmigo, y entonces, él hizo una demanda por Adulterio; entonces él fue convicto . . . él salió absuelto y yo salí convicta.

¿Entonces, pero, que Ud. tiene esas relaciones . . .?

El la reconoció, la reconoció la niña voluntariamente. Ella es Berdecía.

LCDO. CORCHADO JUARBE:

Vamos a objetar todo eso. La mejor prueba está en el expediente. No debería ni siquiera pasar esa prueba.

HON. FISCAL:

¿Esa nena con quién se crió, esa niña?

TESTIGO:

Con ellos. Se la llevaron desde pequeña. Desde la edad de ocho meses, se la llevó él para casa de la mamá.

¿De la mamá de quién?

De la mamá de él.

¿Vivió ella en alguna ocasión con el acusado?

Sí, señor, estuvo un tiempo con él.

¿Hasta cuándo vivió ella con el acusado?

Hasta el momento que salió encinta.

¿Hasta que salió encinta?
    Sí, señor.
¿Dónde vivía ella cuando salió encinta?
Lcdo. Corchado Juarbe:
    Vamos a objetar a todo eso.
Hon. Fiscal:
    ¿Dónde vivía ella cuando salió encinta?
    Con el acusado."

Dispone el Art. 275 del Código Penal que las personas que hallándose dentro de los grados de consanguinidad en que los matrimonios son declarados nulos por la ley, se casaren o cometieren concúbito o adulterio entre sí, incurrirán en pena de presidio por un término máximo de 10 años. La prueba demuestra sin lugar a dudas que a la fecha de la concepción y nacimiento de la perjudicada su madre estaba legítimamente casada con otra persona.

De acuerdo con el Art. 113 del Código Civil, contra el estado de la perjudicada declarado por dicho artículo como nacida dentro del matrimonio de su madre, no se admite otra prueba que la imposibilidad física del marido para tener acceso con su mujer en los primeros 120 días de los 300 que hubiesen precedido al nacimiento del hijo. Dispone el Art. 116 que ese estado puede ser impugnado solamente por el marido o sus legítimos herederos.

Establece el Art. 101 de la Ley de Evidencia como una presunción *concluyente* que, "los hijos de una esposa que cohabita o reside con su esposo, se presume que son indisputablemente legítimos."

No obstante las disposiciones de ley transcritas, en *Agosto v. Javierre*, 77 D.P.R. 471 (1954), una mayoría de este Tribunal reconoció a un hijo nacido de madre casada una causa de acción civil filiatoria a la luz de las disposiciones de la Ley Núm. 229 de 1942, a fin de que dicho hijo pudiera encontrar a su verdadero padre. La causa de acción se le concedió al hijo únicamente, no al Estado o a terceros. Aun

así, se hizo constar que en una situación como la allí presente no debería tramitarse una reclamación *criminal* de abandono o de reclamación de alimentos sin que antes se hubiera establecido la verdadera filiación del reclamante en un procedimiento civil a tal efecto.

Antes de *Javierre*, en *Pueblo* v. *Santiago*, 70 D.P.R. 837 (1950), en donde se trataba de una acción *criminal* por abandono de menores, este Tribunal se negó a sostener la convicción de aquel acusado de abandono por aparecer que la madre de la menor reclamante estaba legítimamente casada con otro. Resolvimos que el Pueblo no tenía una causa de acción para impugnar la legitimidad en aquel procedimiento criminal.

Posteriormente, en *Pérez* v. *Tribunal Superior*, 81 D.P.R. 832 (1960), afrontamos la situación con miras ya a la disposición constitucional que prohibe establecer discrimen por razón de nacimiento y sostuvimos que el Art. 116 del Código Civil no quedó sin efecto *ipso jure* por la disposición constitucional que contiene tal prohibición. Reafirmamos la doctrina de *Pueblo* v. *Santiago*, según dicho caso pudo haber quedado afectado por el posterior de *Javierre*.

En *Pueblo* v. *González*, 26 D.P.R. 424 (1960), sostuvimos que el concúbito con una hija, aunque no fuera reconocida, sostenía una convicción de incesto, contra la alegación de que la paternidad de aquella hija no podía ser investigada judicialmente. En ese caso se trataba de una hija natural no reconocida, y por lo tanto no presentaba el problema aquí envuelto de un hijo nacido dentro del matrimonio de la madre, con las consiguientes presunciones concluyentes y expresiones de ley en cuanto a su estado civil. No obstante ser una hija fuera de matrimonio, dijimos ahí que la prueba se debe examinar con gran cuidado y que ninguna persona debería ser convicta a menos que las manifestaciones de la madre quedaran bien corroboradas.

Independientemente de si a la luz de los casos citados puede o no en este procedimiento criminal establecerse una filiación en las circunstancias de sus hechos, no existió prueba legalmente competente y suficiente en derecho penal que estableciera la relación incestuosa, aparte del concúbito en sí. El fiscal no probó siquiera que Carmen María Negrón no vivía ya con su marido legítimo al tiempo de procrear a la perjudicada o que aquél estuviera incapacitado para la relación sexual con su esposa durante dicho período crucial. Por el contrario, de la declaración de la madre surge razonablemente que ella convivía con su esposo cuando tuvo las alegadas relaciones ilícitas con el apelante.

En esas circunstancias, la propia madre no podría establecer con certeza si ella quedó en estado de embarazo de la perjudicada como resultado de una relación carnal con el apelante o como resultado de las relaciones con su marido. La presunción del Art. 101 de la Ley de Evidencia que rige en todo procedimiento civil o criminal, no fue atacada.

Por razón de que no existe prueba competente en derecho de la relación paterno-filial entre el apelante y la perjudicada en el grado que una convicción criminal demanda, independientemente de si a tono con *Javierre* el Estado tiene o no la causa de acción que allí se le reconoció al hijo para impugnar su legitimidad, entiendo que debe revocarse la sentencia y absolverse al apelante, pero no por razón de sustituir la función de credibilidad que ejerció la Sala sentenciadora en cuanto al acto sexual en sí.